UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JACOB CHARLES STEELE,<br><br>Plaintiff,<br><br>v.<br><br>KIM HOLLAND,<br><br>Defendant. | Case No. 15-cv-01084-BLF<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**<br><br>[Re: ECF 1] |

Petitioner Jacob Charles Steele has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his state conviction. Pet., ECF 1. Respondent filed an answer on the merits. Mem. P. & A. ISO Answer ("Ans."), ECF 17-1. Petitioner filed a traverse. Traverse, ECF 21. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is DENIED.

## I. BACKGROUND

On February 14, 2012, a jury in Humboldt County Superior Court found Petitioner guilty of second degree murder and making criminal threats, and found true an enhancement for discharge of a firearm causing great bodily injury and death. Ans. 1; Ex. 1, Vol. 2, Pt. 3, Clerk's Transcript ("CT") 591–96, ECF 19-5. On April 10, 2012, Petitioner was sentenced to 42 years to life in prison. Ans. 1; Ex. 1, Vol. 2, Pt. 3, CT 631–32, 635–36.

On October 8, 2013, the California Court of Appeal affirmed the judgment of conviction. Ex. C to Pet., ECF 1-3. The California Supreme Court denied review on December 11, 2013. Exs. A & B to Pet., ECF 1-1, 1-2.

Petitioner filed the instant habeas petition on March 9, 2015.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are

from the opinion of the California Court of Appeal on direct appeal[1]:

> Appellant, 23 years old in early 2012, was a native of Eureka who supported himself by selling drugs, and was a friend of the victim, Jerry George, who lived a few blocks away and also dealt drugs and bought cocaine from appellant. After an argument in front of several acquaintances on the night of January 21, 2010, appellant pulled out a .40 caliber gun and shot and killed George in appellant's home. The versions of how that shooting occurred and what happened thereafter varied somewhat, and we will summarize those versions.
>
> According to Hauna Kim, the victim's girlfriend and the mother of their child, George went over to appellant's apartment on Reasor Road in McKinleyville at about 7:30 p.m. on the evening in question, January 21. At about 11 p.m. on that evening, George called Kim from appellant's phone, and told her he and appellant were arguing about a number of things, including how many people drove Mercedes (as George did), and asked her if she knew any other young people who did so; Kim responded in the negative. When George had not returned to their home several hours later, Kim called appellant at around 1:30 a.m., but appellant told her George had left 30 minutes earlier, although he was allegedly drunk. When George never appeared at their home, Kim called some of his family members and drove neighboring roads to try to find him, but could not. Later on January 22, she filed a missing person's report with the police department. She also called appellant several more times over the ensuing days asking him if he knew anything about George's whereabouts.
>
> On the evening in question, appellant's cousin, Richard Steele, was at appellant's apartment when George arrived. Also there were Shawn Hof, appellant's wife Lindsey, and a minor named Trey. Richard Steele also recalled the debate between appellant and George about young people driving Mercedes. He also recalled appellant asking George to leave, but the latter did not. According to Richard Steele, George stood up and said: "You are going to have to fucking move me from here." The two men then got face to face with appellant appearing "kind of ... irritated" and George said to him: "What are you going to do? Pull your fucking pistol out?" And, according to the cousin, appellant who regularly carried a pistol on his right hip at that point in time, did so, cocked it, and then moved backward from George. Richard Steele and appellant's wife Lindsey, left the room at that point, but the former heard a gunshot and came back into the room to find George lying on the floor "with a hole in his head."
>
> Richard Steele asked what had happened, and appellant replied that George had "rushed" him. Richard Steele told him he "should have called the police [but appellant] said no. He wasn't going to lose his son." The two decided

---

[1] This summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1). Petitioner does not contest the accuracy of this factual summary. *See* Pet. 8 ("Generally . . ., the facts of this case, viewed in the light most favorable to the judgment, are as set forth in the unpublished opinion of the state appeals court . . . .").

to work to "get rid of Jerry's body." They commenced to do so by getting a tarp and wrapping George's body in it. Appellant then called Hof, who had apparently also left appellant's house a few minutes before. They then put the body, wrapped in the tarp, in the trunk of appellant's car, and drove away and buried it at a location unspecified by appellant's cousin. In the process, and while driving along Highway 101, Richard Steele threw the barrel of appellant's gun out of the window of the car.

Hof also testified for the prosecution about some of the events of the night in question. He was a methamphetamine addict who worked on appellant's several cars and also apparently lived close by. On the night in question, he was working on one of appellant's cars, but was also in and out of the house and heard the debate between appellant and George about young people driving Mercedes. This debate "escalated into an argument" according to Hof, and appellant asked George "to leave several times." Appellant then "told everybody to get out" but Hof did not, and "tried to get [appellant] to calm down." That effort failed and Hof saw appellant shoot George, and then walk out behind Hof saying "I don't have to deal with that nigger no more. I killed him."

Hof went over to his girlfriend's house, but appellant kept calling him, insisting that he come back, and said if he did not Hof "could end up just like him." Hof then returned and helped bury George's body in a ditch; he also made arrangements with several other friends to clean up appellant's apartment, i.e., the bloody part of the carpet, etc.

At some unspecified time later, appellant, his cousin Richard, and his father, Donny Steele, met a mutual friend named Brian Dulac at a boat landing off of an exit from Highway 101. Appellant told Dulac that a "big black guy" had stolen some of his property earlier, and that when they were "drinking together" later "things got out of hand" and the "black guy rushed him and he shot him." Appellant and his family sought Dulac's advice regarding "getting rid of a body," and Dulac advised them (1) where and when at the mouth of the Eel River was the best place to dispose of a body and (2) "they were going to have to open him up so he wouldn't pop up out on the ocean and wash up on the beach."

Several days later, according to the testimony of Nathaniel Willis, he, appellant, and appellant's father transported George's body to the Eel River and put it into the water. Willis later "burned everybody's clothes" that had been worn that day.

In the same month all this occurred, the Humboldt County Sheriff's Department began an investigation into the disappearance of George. In the course of that investigation, both appellant and his cousin, Richard Steele, stated that George had left appellant's house at 10:45 p.m. on the evening in question, after he "and several friends had been drinking throughout the evening." Appellant did not tell the sheriff's investigator anything about a quarrel between them. In the course of the same investigation, appellant was interviewed by the sheriff's office, and a recording made of it and later played for the jury. In the course of that interview, appellant again said nothing about his having a quarrel

3

with George.

A technician in the Humboldt County Sheriff's office then went to appellant's Reasor Road apartment and examined various devices there, as well as some of his vehicles. She found blood stains on both a carpet cleaner and a vacuum cleaner as well as on a speaker cover. The bed of appellant's truck and a bloody spare tire cover were taken into evidence. The same technician obtained two toothbrushes in order to secure the DNA of George, and also got a sample of the DNA of his sister, April George. A senior criminologist for the Department of Justice's office in Eureka testified that the DNA obtained from several of the Reasor Road sources matched the DNA of the victim, Jerry George, i.e., the DNA obtained from his toothbrushes.

Apparently, Shawn Hof began cooperating with the investigators because, in early August 2010, he took an investigator from the Humboldt County District Attorney's office to a location in McKinleyville, where George's body had first been buried. They found pieces of tarp, duct tape, and two shoes identified as belonging to the victim.

After the close of the prosecution's case, appellant was called as a witness by his attorney. He conceded that, on the night in question, he had indeed shot and killed George. He explained that, on that evening, he, George, Hof, and his wife Lindsey, were all drinking at his home, in the course of which they started arguing about cars, including whether (1) a Cadillac El Dorado was a two-door or four-door car and (2) any other "young people" in the area drove Mercedes, besides appellant. This led to further arguments between appellant and George and the former's request that George leave, which, with his fists allegedly clenched, the latter declined to do. Appellant reiterated his request that George leave his apartment, to which George responded: "You are going to have to fucking move me from here." Appellant "kept asking him to leave politely over and over again and he just kept refusing" but then yelled at appellant: "You better go get your fucking gun" and took a step toward appellant. Appellant then stood up from the couch where he had been sitting, pulled out his gun, cocked it, and asked the other people to leave the room, which they did. Then, when George started moving toward appellant, the latter raised his gun and fired it, killing George.

Appellant then left the house, but returned shortly thereafter with his cousin, Richard Steele. The two of them decided to "cover this up." There followed, as related above, the various "cover ups," including appellant and Hof first burying George's body, throwing away the barrel of the gun, cutting off the bloody portions of the carpet and putting them into garbage bags. Later they met with two persons who advised them how to dispose of the body permanently in the Eel River, which appellant, his father and cousin, and Nathaniel Willis then did, after which they burned the clothes they were wearing. The next day, appellant was interviewed by the sheriff's investigators, and denied that anything untoward had happened to George.

On July 6, 2011, an information was filed count 1 of which charged

4

appellant with first degree murder of George; that count also included four special allegations that appellant personally used a firearm causing great bodily injury and death. Count 2 charged appellant with making criminal threats to Hof on January 22. After a several-week jury trial, the important testimony of which is summarized above, appellant was found guilty of the second degree murder of George and of making criminal threats to Hof, as alleged. Several of the special allegations were also found to be true.

On April 10, 2012, appellant was sentenced to 15 years to life on the first count, 25 years to life on the firearm enhancement, and two years on the second count, i.e., making criminal threats.

On May 24, 2012, appellant filed a timely notice of appeal.

*People v. Steele*, No. A135606, 2013 WL 5535872, at *1–4 (Cal. Ct. App. Oct. 8, 2013) (internal citations omitted) [hereinafter "Cal Ct. App. Decision"].

## III.   LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable

5

application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Here, as noted, the California Supreme Court denied Petitioner's petition for review. Ex. A to Pet. The Court of Appeal thus was the highest court to have reviewed the claim raised in the instant petition in a reasoned decision, and therefore, it is the Court of Appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington*, 131 S. Ct. at 783-85; *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claim.

**IV. DISCUSSION**

Petitioner asserts that he is entitled to federal habeas relief because the trial court's

decision to include the CALCRIM No. 3472 jury instruction violated his right to present a complete defense to the charge of murder in violation of his rights under the Sixth and Fourteenth Amendments. Pet. 4. Specifically, Petitioner claims that the trial court misinstructed the jury when it gave CALCRIM No. 3472 because there was no evidence to support it, and such an instruction should only be given where there is evidence to support it. *Id.*

The following is CALCRIM No. 3472 as given by the trial court at Petitioner's trial: "A person does not have the right to self-defense if he or she provokes a fight or a quarrel with the intent to create an excuse to use force." Cal. Ct. App. Decision, at *4. Petitioner claims that giving the instruction, despite no evidence to support it, made it unnecessary for the jury to consider the defense of self-defense by subtly suggesting the existence of malice aforethought, and thus deprived him of the right to a "complete" defense. Pet. 2.

The Court of Appeal considered this claim of jury instructional error and denied it on direct review:

> Appellant presents only one issue for review, i.e., did the trial court err in instructing the jury with, among many other instructions, CALCRIM No. 3472, which reads: "A person does not have the right to self-defense if he or she provokes a fight or a quarrel with the intent to create an excuse to use force."
>
> We find no error in the trial court's inclusion of this instruction. First of all, this one-sentence instruction was one of four given regarding, in whole or in part, the issue of self-defense. The others given were CALCRIM Nos. 505, 510, and 3475. Two of those, i.e., CALCRIM Nos. 505 and 3475 were specifically requested by defense counsel, and she expressed no objection to No. 510. The only one she objected to was CALCRIM No. 3472, and she did so only briefly, stating: "The objection is that it doesn't reflect the state of the evidence."
>
> The court then allowed the prosecutor to respond, which he did by saying: "As succinctly as I can, your Honor, I believe it, in fact, does. The state of the evidence is that there's a verbal argument taking place between—per the defendant, between he and Jerry George. The defendant pulled a gun on Jerry George. He escalated it into a situation necessitating or creating a situation where Jerry George might act in self-defense. He's the one that escalated it into a fight; and at that point, Jerry George had a legal right to defend himself. And he can't, then, subsequently after pulling a gun on someone when someone actually allegedly tries to take the gun from them say that when he shot that person, he was acting in self-defense. He, in fact, created the scenario where he gets to kill Jerry George per his version of events."
>
> The court then commented: "Sure. 3472 is a correct statement of the law

7

and I think there is sufficient basis in which, depending on how you view the evidence, to give 3472. So the Court will give 3472 as requested."

Defense counsel offered no response to either of these statements. Nor, in his brief to us, does appellant cite much less discuss the one reported authority which addresses the argument that the giving of that instruction was error. In *People v. Olguin*[2] the court said: "Without objection, the trial court instructed the jury with a series of CALJIC self-defense instructions which included CALJIC No. 5.55. [Now CALCRIM No. 3472.] Counsel were specifically asked if they had any objection to this instruction and said they did not. Mora [one of the appellants] now argues the instruction was erroneous as a matter of law because it does not require a specific intent to create a self-defense pretext for assault, and because it was inapplicable to the facts of the case."

"We agree the instruction had no antecedent in the facts of this case. Neither we nor the Attorney General can find facts that would support it. But we are mindful of the trial court's unique position for determining such issues: 'A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury. A reviewing court certainly cannot do so where, as here, the trial court's determination was agreeable to both the defense and the prosecution.'"

"Nor are we convinced the instruction had any bearing on the outcome of the trial. It was part of a packet of a dozen self-defense instructions, some of which were mutually exclusive. It was obvious to anyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to 'Disregard any instruction which applies to facts determined by you not to exist.' By all appearances, they understood their charge in this regard."

"Mora suggests the instruction might have kept the jury from evaluating his self-defense claim, but we don't see how. This very same argument about the same instruction was made—and rejected—in *People v. Crandell*,[3] where the court concluded, 'we are confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error.' So do we."

For several reasons, we have no difficulty in rejecting appellant's argument—again, his sole argument on this appeal—that the giving of CALCRIM No. 3472 was error. The first reason is that, unlike the situation in *Olguin* and *Crandell*, the facts here make clear that the jury could well have found that appellant may have been provoking "a fight or a quarrel" with George with the intention of trying to see if he could create enough tension between them to provoke George to take some action which might justify his taking out, cocking,

---

[2] 31 Cal. App. 4th 1355, 1381 (1991).
[3] 46 Cal.3d 833 (1988), *overruled on other grounds in People v. Crayton*, 28 Cal.4th 326, 364–65 (2002).

8

and then firing the pistol he was carrying in his waist. Which is precisely what happened. Thus, per his cousin, Richard Steele, appellant became "kind of . . . irritated" during the course of his argument with George, an irritation which may have derived from appellant's earlier suspicions that George might have stolen "stuff out of his safe."

Hof testified that he, also, had tried to get appellant to "calm down." Neither he nor appellant's cousin succeeded, which led to the shooting. Hof also testified that, immediately after the shooting, appellant said: "I don't have to deal with that nigger no more. I killed him." This statement is certainly consistent with appellant having provoked the fight.

Thus, the point of CALCRIM No. 3472 was, unlike the situation in *Olguin*, directly relevant here: there was, in fact, evidence in the record that appellant was, at least in part, provoking "a fight or quarrel" which led to the shooting of George. Appellant is thus incorrect when he argues that "there was no evidence in the record that appellant provoked a fight with Mr. George as an excuse to use force." There may have been no testimony as to appellant's *motive* for behaving threateningly to George, but there certainly was evidence in the record that both men were behaving threateningly toward the other. Indeed, appellant acknowledges such when he states in his opening brief that several witnesses testified "that the argument became heated with both Mr. George and appellant very angry and shouting at each other." And, of course, appellant was the one who was—and apparently always was—armed.

Further, the law is clear that: "A party is entitled to a requested instruction if it is supported by substantial evidence."

Lastly, the holdings of our Supreme Court in *Crandell* and of our colleagues in the Fourth District in *Olguin* are also relevant here: even assuming there were insufficient factual bases for the inclusion of CALCRIM No. 3472 among the several instructions given by the court relating to self-defense, appellant makes no showing nor offers any reasonable argument in his briefs to us as to why any such error was harmful to his defense in this case. He does note that the prosecutor alluded, albeit briefly, to the substance of this instruction, but fails to note that this reference composed just a few lines in that counsel's arguments to the jury. That argument consumed over 30 pages of the reporter's transcript, and stressed appellant's obvious dislike of his "nigger" neighbor, his behavior toward George on the night in question, and his oversight of the disposal of George's remains after the killing. In short, CALCRIM No. 3472 played an extremely minimal part of the prosecutor's argument to the jury, and thus any error in giving it was clearly harmless.

Cal. Ct. App. Decision, at *4–6 (citations omitted) (footnotes added)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147

(1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional right]." (citation and internal quotation marks omitted)). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988); *see, e.g.*, *Middleton v. McNeil*, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted); *see Calderon v. Coleman*, 525 U.S. 141, 146–47 (1998).

Here, the state trial court gave the standard instructions on perfect self-defense, CALCRIM No. 505, and imperfect self-defense, CALCRIM No. 571, but also instructed on the right to eject a trespasser from real property, CALCRIM No. 3475, and instructed the jury that the right to self-defense may not be contrived, CALCRIM No. 3472. Ex. 2, Vol. 4, Pt. 3, CT 1096–1105, ECF 20-5. Petitioner objected only to the latter instruction on the basis that it "doesn't reflect the state of the evidence." Cal. Ct. App. Decision, at *4.

Petitioner's habeas argument in this Court largely parallels the position he took before the California Court of Appeal. Petitioner does not claim that the instruction on contrived self-defense was an erroneous statement of state law. His argument is that the instruction did not apply, and that giving it effectively deprived him of his Sixth Amendment right to present a "complete defense." Pet. 2.

10

The right to due process of law encompasses the right to present a "complete" defense. "Due process requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness" and that "criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 442 F.3d 708, 714 (9th Cir.), *cert. denied*, 549 U.S. 1027, (2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). However, "[g]iving an instruction which is not supported by the evidence is not a due process violation." *Bolton v. McEwen*, No. C 09-4266, 2011 WL 5599712, at *9 (N.D. Cal. Nov. 17, 2011) (citing *Griffin v. United States*, 502 U.S. 46, 55–60 (1991)). Moreover, Petitioner does not cite, and the Court is not aware of any clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law. To the contrary, at least one court addressing the exact issue at bar here concluded that a state court's decision to give CALCRIM No. 3472 did not violate due process because the petitioner did not claim that the instruction of state law was inaccurate and did not "cite clearly established law constitutionally prohibiting a trial court from instructing a jury on an irrelevant but accurate statement of state law." *See, e.g.*, *Fernandez v. Montgomery*, 182 F. Supp. 3d 991, 1013 (N.D. Cal. 2016). Accordingly, to the extent that Petitioner's claim is based on the state trial court giving an instruction on a factually inadequate theory, the Court denies the claim.[4]

In any case, the California Court of Appeal found that there was evidence to support an instruction on self-defense as a contrivance. As quoted above, the state court found:

> [U]nlike the situation in *Olguin* and *Crandell*, the facts here make clear that the jury could well have found that appellant may have been provoking "a fight or a quarrel" with George with the intention of trying to see if he could create enough tension between them to provoke George to take some action which might justify his taking out, cocking, and then firing the pistol he was carrying in his waist. Which is precisely what happened.

---

[4] For this reason, the Court DENIES Petitioner's request for an evidentiary hearing. *See* Traverse 2. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schiro v. Landigran*, 550 U.S. 465, 474 (2007). Because it does not violate due process for a trial court to give an accurate but purportedly irrelevant jury instruction, even if Petitioner is correct as to the facts, he would still not be entitled to federal habeas relief.

11

Cal. Ct. App. Decision, at *5.

As Respondent correctly states, a state court's factual finding regarding whether there was sufficient evidence to warrant an instruction under state law is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), which can only be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also* Ans. 12–13. Disagreement with the state court's interpretation of the facts made by reiterating the same contentions made previously does not satisfy this burden. *See* 28 U.S.C. § 2254(e)(1); *Sophanthavong v. Palmateer*, 378 F.3d 859, 866–67 (9th Cir. 2004). This is exactly what Petitioner attempts to do here. Moreover, Petitioner does not dispute the accuracy of the evidence cited by the state court; he merely asks this Court to find it insufficient based on evidence he prefers to emphasize. *See, e.g.*, Traverse 4. Specifically, Petitioner contends that the state court omitted critical evidence in its analysis, namely that Petitioner was aware at the time of the killing that George could not return to Louisiana because he had assaulted a police officer; Petitioner was aware at the time of the killing that George had assaulted his live-in girlfriend; George was 6'3" tall and wore size 12 shoes; prosecution witness Richard Steele testified that George looked like he was going to punch Petitioner, and Petitioner is only 5'7" tall; Richard Steele further testified that Petitioner asked George to leave his property "four or five" times; and Richard Steele could not recall saying that Hof had said, "[w]e took care of that nigger," or words to that effect. Pet. 12. On the other hand, Petitioner does not contest the accuracy of the state court's factual finding regarding the evidence in support of the instruction, which included that Petitioner may have suspected that George had stolen items from his safe; Petitioner would not calm down despite efforts to calm him down; and after the shooting, Petitioner said "I don't have to deal with that nigger no more. I killed him." Cal. Ct. App. Decision *5. Instead, Petitioner suggests that no reasonable juror, considering all of the facts before it, would find that the defense of self-defense was contrived. *See* Pet. 8. However, where "reasonable minds reviewing the record might disagree," on habeas review "that does not suffice to supersede" a state court factual finding. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). Thus, in light of the presumption of correctness of the state court's factual findings, which Petitioner has not overcome, the Court cannot conclude that there was so little evidence to support the inference

that Petitioner provoked the fight with George with the intent of using the argument as justification to kill him.

The state appellate court also found that it was not reasonably probable that any error flowing from the trial court's decision to instruct on self-defense as a contrivance affected the jury's verdict, rendering any error harmless. Cal. Ct. App. Decision, at *6. It reasoned that "CALCRIM No. 3472 played an extremely minimal part of the prosecutor's argument to the jury, and thus any error giving it was clearly harmless." *Id.* The Court accords deference to the state court's harmless error determination and, in any case, finds that any instructional error by the trial court did not have a "substantial and injurious effect or influence" on the jury's verdict such that federal habeas relief is appropriate. *See Garcia v. Long*, 808 F.3d 771, 781–82 (9th Cir. 2015) (federal courts accord deference to state law harmless error determinations but ultimately apply the *Brecht* harmless error test) (quoting *Brecht*, 507 U.S. at 622–23) (federal habeas relief is available only if a state court's constitutional error had a "substantial and injurious effect or influence" on the jury verdict or trial court decision). Accordingly, there is no merit to this claim.

Based on the foregoing, the state court's rejection of Petitioner's jury instruction claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### V. CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254

Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: May 12, 2017

*/s/ Beth Labson Freeman*
BETH LABSON FREEMAN
United States District Judge